Rockingham
No. 86-106

TOWN OF WINDHAM

v.

HOWARD AND JOANNE ALFOND

December 30, 1986

*Beaumont, Mason & Campbell P.A.*, of Salem (*Bernard H. Campbell* on the brief and orally), for the plaintiff.

*Holland, Donovan, Beckett and Welch P.A.*, of Exeter (*William H. M. Beckett* on the brief and orally), for the defendants.

SOUTER, J.   The plaintiff town appeals an order of the Superior Court (*Nadeau*, J.), denying an injunction against the defendants' use of their residentially zoned property for the stabling and pasturing of horses kept for their personal recreation. The town contends that the court erred both in ruling that keeping horses was lawful as accessory to residential use under the local zoning ordinance, and in concluding that the conduct of town officials would, in any case, disqualify the town from obtaining the injunction requested. We reverse.

In February, 1983, the defendants, Howard and Joanne Alfond, purchased a house on six acres of land in a Residence A zoning district of Windham. In September, Mr. Alfond applied to the town building department for a permit to build a barn. Although the related construction plans did not indicate that the barn would be built to house animals, Mr. Alfond told the assistant building inspector, Robert Mackey, that he meant to keep horses in the barn. Mr. Mackey showed Mr. Alfond the zoning provisions for permitted uses in a Residence A district and advised him that keeping horses was not among them. Mr. Alfond left his permit request on file nonetheless, and Mr. Mackey added the adjective "storage" to the reference to "barn" on the application.

Mr. Alfond then consulted legal counsel, who advised that keeping horses would be lawful. When Mr. Alfond took this position on his next visit to the building department, Mr. Mackey again told him that it would be lawful under the ordinance to use the proposed barn for storage but not for horses. Mr. Alfond responded by saying "call it anything you want, we're putting horses on the property in that barn. . . . I don't care what you call it, but horses are going on the property." Despite the disagreement, Mr. Mackey proceeded to issue a building permit, although there was evidence that the permit described the building as a "storage barn."

The controversy continued. Before any construction began, the defendants' counsel wrote to the town formally stating that the Alfonds intended to keep horses in the barn. Mr. Mackey replied for the town that keeping horses would be unlawful without a zoning variance.

Mr. Mackey inspected the defendants' property in December, 1983, and May, 1984, by which time nothing more than footings had been constructed. In connection with the latter visit, Mr. Mackey again wrote to the defendants, again stating that keeping horses would violate the ordinance in the absence of a variance. Within two weeks, Mrs. Alfond filed an application for a variance, and while it was pending, the Alfonds bought an adjoining lot of some five-and-a-

half acres. Although the variance was thereafter denied, the Alfonds took no appeal and proceeded with the building.

The building inspector, Mr. Lamere, later made a third inspection, at which time no horse stalls had been constructed, but stalls were in place when Mr. Mackey returned for a fourth inspection in July, 1984. The Alfonds brought horses onto the property a month later, and in November the town advised the Alfonds' counsel that if the horses were not removed, the town would begin action to enforce the zoning ordinance. The Alfonds kept the horses, and this injunction proceeding followed.

■ The Windham zoning ordinance is an example of the so-called permissive variety. *See* LAND USE REGULATIONS AND ZONING ORDINANCE FOR THE TOWN OF WINDHAM, N.H. § VI, C., 1. (hereinafter "ORDINANCE"); *Treisman v. Kamen*, 126 N.H. 372, 375, 493 A.2d 466, 470 (1985). In the absence of a variance or special exception, such an ordinance functions generally to prohibit uses of land unless they are expressly permitted as primary uses or can be found to be accessory to a permitted use. *Id.* at 375–76, 493 A.2d at 470.

As a first step in·the application of such an ordinance one looks to the list of primary uses permitted in a given district established by the ordinance. So far as they are relevant here, the following provisions for permitted uses in the Residence A district occur in § VI, C., 1. of the Ordinance:

> "C. Residence District A, B and C: The Residence Districts are intended as an area district for residences:
> 1. Uses Permitted:
>     a. Single-family detached dwellings.
>     b. Fields, woodlots and greenhouses as permitted in the Rural District
>     c. Accessory buildings and uses
>     . . . ."

In its narrative opinion, the trial court spent no time discussing the scope of the uses permitted by this language, and rightly so. The Ordinance does not expressly permit the keeping of horses or any other pets, and the legality of keeping them is properly regarded as an issue not of primary, but of accessory, use.

Before we turn to the trial court's treatment of that subject, however, we should take note of the defendants' argument that keeping horses is a primary permitted use, by virtue of the provision for the use of "[f]ields . . . as permitted in the Rural District." We recognize at the outset that there is a real question whether this argument is even properly before us. We do not read the trial court's opinion as

concluding that keeping horses was a primary permitted use, and the defendants have taken no cross-appeal from the court's failure to make such a ruling. The trial court did address the issue obliquely, however, in denying the town's request to find that the reference to "fields" did not permit horses, and we will accordingly assume for the defendants' sake that the issue of primary use may be argued on this appeal.

In maintaining that permission to use "fields" should be read to permit horses on the fields, the defendants invoke a dictionary definition of "fields" as "an area of cleared enclosed land used for cultivation or pasture," WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 845 (1961), and argue that permitting the use of a field for pasture necessarily permits the presence of an animal to graze the pasture land. We think the town is correct, however, in pointing out that a reading of the whole ordinance indicates otherwise. *See Merrill v. Great Bay Disposal Serv.*, 125 N.H. 540, 543, 484 A.2d 1101, 1103 (1984) (statutory construction must consider entire statute, since all words must be given effect).

■ By the applicable terms of the ordinance, the scope of "fields" is its scope as used in the section governing the rural district. That portion of the ordinance not only provides for the use of land as "fields," § VI, B., 1., d., but also expressly allows the use of land for "grazing," § VI, B., 1., a., 2., and for "pastures" as well, § VI, B., 1., d. The express listing of grazing and pasture uses in addition to the use of land as "fields" consequently implies that permission to use land for "fields" does not include permission for grazing and grazing animals. *See Merrill v. Great Bay Disposal Serv., supra* at 543, 484 A.2d at 1103 (drafters presumed not to have used superfluous or redundant words). The adoption of the same definition of "fields" in the Residence A section of the ordinance does not, therefore, carry with it the permission for grazing that the defendants seek. This conclusion is consistent not only with the town's administrative interpretation, which is entitled to consideration, *see Trottier v. City of Lebanon*, 117 N.H. 148, 150, 370 A.2d 275, 277 (1977), but also with the common-sense expectation that provisions of a zoning ordinance for the most restrictive single residential use of land probably would not include permission to keep large grazing animals.

■■ We proceed now to the issue on which the trial court placed principal emphasis, whether keeping horses is lawful as a use accessory to the primary residential use when open field space is available. An accessory use of property is one that is not expressly permitted by the ordinance itself, *Town of Salem v. Durrett*, 125 N.H. 29, 32, 480 A.2d 9, 11 (1984), but is occasioned by and subordi-

nate to the permitted primary use, *Gratton v. Pellegrino*, 115 N.H. 619, 621, 348 A.2d 349, 351 (1975), and customarily, *Dumais v. Somersworth*, 101 N.H. 111, 113, 134 A.2d 700, 701 (1957), or habitually associated with it, *Becker v. Hampton Falls*, 117 N.H. 437, 440, 374 A.2d 653, 655 (1977). *See* ORDINANCE §§ II; VI, C., 1., c. While the strength or degree of the customary or habitual association does not lend itself to definition by formula, and while the combination need not occur in a majority of instances of the principal use, *Town of Salem v. Durrett supra,* the uses must be associated with a frequency that is substantial enough to rise above rarity. *See id.*

▮ We have held that a landowner who claims the benefit of the accessory use doctrine has the burden to plead his reliance upon it and to produce evidence sufficient to permit a prima facie inference that the disputed use qualifies as an accessory one. *Treisman v. Kamen, supra* at 377–78, 493 A.2d at 471. Although the defendants in this case satisfied their burden of pleading, and although they produced some relevant evidence, the evidence was insufficient to make a prima facie showing of accessory use.

The principal focus of the dispute here is not upon the first prong of the accessory use definition, dealing with occasioned and subordinate use, but upon the sufficiency of the evidence to establish that the association between the residential use of property and the keeping of horses is substantial enough to qualify as customary or habitual. The defendants' obligation to offer evidence on this point is underscored by a fact of which the trial court could properly take notice, N.H. R. Ev. 201(a), that Windham is in a portion of the State under pressure of residential crowding as population spills north from Massachusetts, from which the court could reasonably infer that traditional rural stereotypes are no longer sound indications of actual conditions in the area. It is therefore significant that testimony at trial indicated that during the past twenty years only six owners of Windham properties in residential zones had at one time or another kept horses, and that only two or three of them continued to do so at the time of trial. Three instances do not amount to a substantial association of residential property ownership and horse keeping, and the evidence does not, therefore, rise to the level of a prima facie showing on the issue of accessory use. *See Becker v. Town of Hampton Falls*, 117 N.H. 437, 441, 374 A.2d 653, 655 (1977).

▮▮ While this point is obvious when we isolate it this way, it was perhaps less clear at trial because of the court's emphasis on considerations such as the size of the property, the quality of its improvements and the presence of trees to screen the defendants'

activities from their neighbors. Although the court addressed these matters because it believed that "each question of accessory use should be determined on the peculiar facts," the facts thus cited are not relevant to the issue of accessory use. The application of the accessory use doctrine requires evidence of substantial customary association of the principal and subordinate uses, whereas evidence of the peculiar character of the property in question does not address this issue. The evidence that does address the issue is, as we have said, insufficient to satisfy the defendants' burden under *Treisman*. Hence, we hold that the record before us does not permit the finding of customary association that is essential to any conclusion that keeping horses is a use accessory to the occupancy of residential property in Windham.

This conclusion does not, however, lead directly to a reversal of the order below. The trial court made further findings that might appear to stand in the way of the injunction sought by the town, and we must attend to them before coming to a final result in this appeal.

First, the court found "no rational basis for a determination under the zoning ordinance prohibiting the use of this barn and the keeping of horses by the defendants on this property." Despite its clothing in the language of "rational basis," this statement does not raise any issue that we have not discussed already. We understand the trial court to be saying that it had no grounds to conclude that the zoning ordinance prohibits the defendants from keeping horses in their barn, and we have already held that position to be error.

Next, the court stated that it could "find no rational basis [for] allowing [horses] in the Rural District but not on the defendants' property." To support this conclusion, the defendants point out both that minimum lot size requirements are the same in each district and that the Rural District includes congested residential building that would justify the prohibition of horses, if horses are to be prohibited at all. Finally, they emphasize that the road past their property marks a division between the two districts.

█ All this may be true, but the court's observation and the defendants' arguments boil down to nothing more than a claim that the lines separating the zones could have been drawn differently from where they actually were drawn. Suffice it to say that if this alone were enough to undermine the validity of a zoning ordinance, not many ordinances would survive intact. Topographical variations do not always point to appropriate district lines, and it is the essence of zoning to draw these lines before uncontrolled commercial selection has made them pointless. *See generally* RATHKOPF, THE LAW OF

ZONING AND PLANNING § 16.01. The fact that such a line once fixed could have been fixed elsewhere cannot, then, be accepted as a defense to an enforcement action, lest the lines be subject to perpetual erosion. *See* RATHKOPF, *supra* § 16.05[1] n.1. One can hardly improve on the simple observation of the Supreme Court of Illinois, that

> "[t]he fixing of zoning lines is a matter of legislative discretion and necessarily results in a different classification of uses on either side of the line. This does not render limitations on use of property near the boundary line in a more restricted district unreasonable or invalid."

*Wesemann v. Village of La Grange Park*, 407 Ill. 81, 89, 94 N.E.2d 904, 909 (1950) (citations omitted). Although the line may seem arbitrary to the resident on the restrictive side, the presumption of an ordinance's validity is entitled to prevail. *See Town of Nottingham v. Harvey*, 120 N.H. 889, 892, 424 A.2d 1125, 1127 (1980).

Next, we consider the trial court's observation that

> "[e]ven if the building and keeping of horses were not specifically allowed on this property, I would decline to grant injunctive relief because of the circumstances surrounding the application for, issuance of, and construction pursuant to the building permit."

The court did not explain further, but the record indicates that the court was responding to claims that permeate the defendants' pleadings, as they permeate the defendants' brief before us, that the town's building department acted with a negligence or downright impropriety that disqualifies the town from obtaining any relief. The defendants variously charge that the town "set [them] up", that town officials dishonestly tampered with the application for the building permit, and that the building department issued a permit for a use that it then turned around and sought to enjoin as illegal.

Speaking generally, we will agree that if the town had refused the permit the entire controversy would have been resolved, one way or another, sooner than it will be now. But we can not find any suggestion in the record that the town ever led the defendants to think that keeping horses was permissible under the ordinance; the evidence, on the contrary, is uncontradicted that from the moment Mr. Alfond first visited the building department, the town expressed its position without any equivocation. The town officials continually and consistently maintained that using the barn to keep horses would be illegal, and the only reasonable interpretation of the

evidence is that Mr. Alfond knew the town's position at all relevant times but chose to take his chances with the law. The defendants are in no position to make even a colorable claim to municipal estoppel, *see City of Concord v. Tompkins*, 124 N.H. 463, 467–69, 471 A.2d 1152, 1154–55 (1984), or to argue that the town delayed in communicating its position and thereby rendered injunctive relief inequitable.

Nor do we see merit in the argument that in the past the town has failed to enforce the ordinance to such an extent that it should be barred from enforcing it now. If we assume *arguendo* that none of the instances of horse keeping indicated in the record were lawful uses predating the ordinance, the law is clear that "a municipality's failure to enforce an ordinance does not constitute ratification of a policy of nonenforcement and, consequently, will not estop a municipality's subsequent enforcement of the ordinance." *Id.* at 470, 471 A.2d at 1155–56 (citation omitted). Although the defendants now seek to avoid this rule by raising the more damning claim that they are victims of a maliciously intentional discrimination, *see id*; *Weare v. Stone*, 114 N.H. 80, 82, 314 A.2d 638, 639 (1974), their pleadings did not go beyond the assertion of simple discrimination consisting of the town's attempt to enforce the ordinance in this instance, despite its failure to do so in others. Such allegations do not charge the conscious, intentional discrimination to which the *Concord* and *Weare* cases alluded, and because the defendants raised no such claim below, they may not raise it here. *Daboul v. Hampton*, 124 N.H. 307, 471 A.2d 1148 (1983).

Before closing this opinion, we should take brief note of other issues that the defendants have mentioned before us but had declined to raise below, probably for good reasons. They argue that the requested enforcement of the ordinance would violate State Constitutional norms under the holdings of *Burrows v. City of Keene*, 121 N.H. 590, 432 A.2d 15 (1981), *L. Grossman & Sons, Inc. v. Town of Gilford*, 118 N.H. 480, 387 A.2d 1178 (1978), and *Metzger v. Town of Brentwood*, 117 N.H. 497, 374 A.2d 954 (1977). We can only say that, on the most sanguine view, the theories underlying these cases would be of doubtful help to the defendants, even if they were before us for consideration. Finally, we note that the trial court properly excluded evidence bearing on the validity of the town's action to adopt the ordinance; the defendants' pleadings raised no such issue for adjudication.

The case will be remanded for entry of a declaration that the keeping of horses on the defendants' property violates the ordi-

nance, and for further proceedings to consider the appropriate terms of an injunction, if one is necessary.

*Reversed and remanded.*

All concurred.