Grafton
No. 2010-399

NEW HAMPSHIRE RESIDENT LIMITED PARTNERS OF THE LYME TIMBER COMPANY

v.

NEW HAMPSHIRE DEPARTMENT OF REVENUE ADMINISTRATION

Argued: March 17, 2011
Opinion Issued: May 26, 2011

*McLane, Graf, Raulerson & Middleton, P.A.*, of Manchester (*Wilbur A. Glahn, III* and *Steven J. Dutton* on the brief, and *Mr. Glahn* orally), for the petitioners.

*Michael A. Delaney*, attorney general (*Karen A. Schlitzer*, assistant attorney general, on the brief and orally), for the respondent.

LYNN, J. The respondent, New Hampshire Department of Revenue Administration (DRA), appeals a decision of the Superior Court (*Vaughan*, J.) ruling that distributions which The Lyme Timber Company (Lyme) made to the petitioners, certain of its limited partners who reside in New

Hampshire, are not taxable income to the individual petitioners because their beneficial interests in Lyme are not "transferable shares" within the meaning of RSA chapter 77. *See* RSA 77:3 (2003) (amended 2004, 2009, 2010); RSA 77:4, III (2003) (amended 2009, 2010). We reverse and remand.

The following undisputed facts are drawn from the trial court's order and the summary judgment record. Lyme is a limited partnership that owns, develops, and manages commercial real estate and timberland. Lyme's partnership agreement, in effect during the relevant times, provided in part:

> 11. *Assignment of Partnership Units.* A Limited Partner may sell or assign his Partnership Units but only on the following terms and conditions:
>
> (a) The Limited Partner shall furnish the Partnership with an opinion of counsel satisfactory to the General Partner that the sale or assignment is in compliance with applicable securities laws and regulations.
>
> (b) The purchaser or assignee shall consent in writing, in form satisfactory to the General Partner, to be bound by the terms of this Agreement in the place and stead of the Limited Partner.
>
> (c) Such assignment is to another Partner or a member of the Limited Partner's family or (1) pursuant to a bona fide written offer, (2) the Limited Partner has given the Partnership 60 days to match the offer and (3) the Partnership has not done so.

In 2005, the DRA's audit division reviewed Lyme's distributions to the petitioners and issued notices of assessments to the petitioners for taxes and interest due for the tax years 2002, 2003 and 2004. Although Lyme itself had paid the interest and dividends taxes for these years, the audit division determined that the individual petitioners were responsible for the taxes because their beneficial interests in Lyme were represented by "transferable shares." *See* RSA 77:3, :4, III. The petitioners sought redetermination by DRA and, after a hearing, a DRA hearings officer upheld the audit division's assessments. *See generally* RSA 21-J:28-b (Supp. 2010).

The petitioners appealed the DRA's decision to the superior court. *See* RSA 21-J:28-b, IV (superior court "shall hear the appeal *de novo*"). Ruling on cross-motions for summary judgment, the trial court granted the petitioners' motion and denied DRA's motion, thereby reversing the decision of DRA. The court ruled that the relevant DRA regulations

relating to the meaning of "transferable shares" under RSA 77:3 and :4, III contained a number of ambiguities, that the regulations could be reasonably interpreted in a manner that favored the petitioners, and that the ambiguities had to be resolved in favor of the petitioners as the taxpayers. This appeal followed.

In reviewing the trial court's summary judgment rulings, we consider the affidavits and other evidence, and all inferences properly drawn from them, in the light most favorable to the non-moving party. *See N. Sec. Ins. Co. v. Connors*, 161 N.H. 645, 649 (2011); *see also* RSA 491:8-a (2010). If our review of that evidence discloses no genuine issue of material fact, and if the moving party is entitled to judgment as a matter of law, we will affirm the grant of summary judgment. *N. Sec. Ins. Co.*, 161 N.H. at 649. We review the trial court's application of the law to the facts *de novo. Id.*

Resolution of this appeal requires us to construe statutes and regulations;[1] we apply the same principles of construction in interpreting both. *Vector Mktg. Corp. v. N.H. Dep't of Revenue Admin.*, 156 N.H. 781, 783 (2008). When construing statutes and administrative regulations, we first examine the language used, and, where possible, we ascribe the plain and ordinary meanings to words used. *See Appeal of Union Tel. Co.*, 160 N.H. 309, 317 (2010); *Vector Mktg.*, 156 N.H. at 783. Words and phrases in a statute are construed according to "the common and approved usage of the language" unless from the statute it appears that a different meaning was intended. RSA 21:1, :2 (2000); *see Pheasant Lane Realty Trust v. City of Nashua*, 143 N.H. 140, 142 (1998). Additionally, we interpret disputed language of a statute or regulation in the context of the overall statutory or regulatory scheme and not in isolation. *Appeal of Union Tel. Co.*, 160 N.H. at 317 (interpreting statutes); *Vector Mktg.*, 156 N.H. at 783 (interpreting regulations). We seek to effectuate the overall legislative purpose and to avoid an absurd or unjust result. *See Residents Defending Their Homes v. Lone Pine Hunter's Club*, 155 N.H. 486, 488 (2007). Courts can neither ignore the plain language of the legislation nor add words which the lawmakers did not see fit to include. *Appeal of Garrison Place Real Estate Inv. Trust*, 159 N.H. 539, 542 (2009).

An administrative regulation adopted by an agency pursuant to a statute is "*prima facie* evidence of the proper interpretation of the . . . statute." *Cagan's Inc. v. Dep't of Rev. Admin.*, 126 N.H. 239, 248 (1985). And while we accord deference to an agency's interpretation of its regulations,

---

[1] As noted by the trial court, various parts of RSA chapter 77 have been amended at different times, and changes to DRA rules have also taken effect. The parties agree about which version of the statutes and regulations apply, and this opinion refers to that law as it existed at the times relevant to this litigation.

"our deference is not total, because we still must examine the agency's interpretation to determine if it is consistent with the language of the regulation and with the purpose which the regulation is intended to serve." *Vector Mktg.*, 156 N.H. at 783 (citation, brackets and quotation omitted). If a taxing statute or regulation is ambiguous, we construe it against the government and in favor of the taxpayer. *See Cagan's, Inc.*, 126 N.H. at 248-49; *see also Pheasant Lane Realty Trust*, 143 N.H. at 143 ("Because the power to tax arises solely by statute, the right to tax must be found within the letter of the law and is not to be extended by implication." (citations and quotation omitted)). We are the final arbiter of the intent of the legislature as expressed in the words of a statute considered as a whole, *Appeal of Union Tel. Co.*, 160 N.H. at 317, and our review of the interpretation of both statutes and administrative rules is *de novo, see Appeal of Gamas*, 158 N.H. 646, 648 (2009) (interpreting statute); *Appeal of Murdock*, 156 N.H. 732, 735 (2008) (interpreting administrative rule). With this framework in mind, we turn to the statutes and regulations relevant to this appeal.

Under RSA 77:4, III, taxable income includes "[d]ividends . . . on shares in partnerships . . . the beneficial interest in which is represented by transferable shares." RSA 77:3 specifies who is subject to taxation for income received from interest and dividends. It provides in part:

I. Taxable income is that income received from interest and dividends during the tax year prior to the assessment date by:

(a) Individuals who are inhabitants or residents of this state for any part of the taxable year whose gross interest and dividend income from all sources exceeds $2,400 during that taxable period.

(b) Partnerships, . . . *the beneficial interest in which is not represented by transferable shares*, whose gross interest and dividend income from all sources exceeds $2,400 during the taxable year . . . .

(Emphasis added.); *see* RSA 77:14 to :17 (2003) (repealed 2009); *see also* RSA 77:14-a to :14-d (Supp. 2010).

■ Therefore, pursuant to the statutory scheme, a partnership entity is subject to taxation under RSA chapter 77 for income received from interest and dividends when the beneficial interest in the partnership is *not* represented by transferable shares. But if the beneficial interest in the partnership *is* represented by transferable shares, the individual limited partners are subject to taxation on such income.

The term "transferable" is not defined by statute. However, during the years at issue, the following DRA regulations were in effect. Rule 901.02 provided, in relevant part: " 'Beneficial interest in which is *not* represented by transferable shares,' *as used in RSA 77:3, I(b)*, means an interest in an organization . . . [w]here the shares, equity interests and all ownership rights *are not transferable* without obtaining prior member approval or causing a dissolution of the organization." N.H. ADMIN. RULES, Rev 901.02 (amended 2010) (emphasis added). Rule 901.03 provided, in relevant part: " 'Beneficial interest in which *is* represented by transferable shares,' *as used in RSA 77:4, III*, means an interest in an organization . . . [w]here the shares, equity interests and all ownership rights *are freely transferable* without the necessity of securing prior member approval or causing dissolution of the organization." *Id.* 901.03 (amended 2010) (emphasis added). Finally, former Rule 901.17 defined "transferable," as used in RSA 77:3, I(b) and RSA 77:4, III, to mean "the ability of a shareholder or interest holder in an organization to dispose of, *by any means*, all rights incidental to his interest without a required *approval* of the disposition by another member, and without dissolution of the organization itself." *Id.* 901.18[2] (amended 2010) (emphasis added).

The superior court found that these regulations contained several ambiguities. First, it determined that use of the term "transferable" under Rule 901.02, and the phrase "freely transferable" under Rule 901.03, created ambiguity in the regulations. It concluded, "[A] reasonable meaning of 'freely transferable' is that the limited partner must be able, without any restriction, to dispose [o]f his or her rights and interests by any means of his or her choosing without first obtaining approval. Under this interpretation, the units at issue in this case are not 'freely transferable' because transfers are subject to the restrictions and conditions set forth in paragraph 11 of the Partnership Agreement."

Second, the court ruled that the definition of "transferable" under Rule 901.17 was ambiguous in that the phrase "by any means" and the term "approval" were subject to multiple reasonable interpretations. It determined that "by any means" could mean that for the shares to be "transferable," the limited partner must be able to dispose of the shares, without approval, by at least *one* single means or by *all* possible means of disposal that might be chosen by the limited partner. It concluded that the latter meaning favored the petitioners: "Under the Partnership Agreement, a limited partner cannot dispose of his or her interest by any means

---

[2] Former Rule 901.17 became effective on August 10, 2004 and was the operative rule for the 2004 tax year. For the two prior tax years, 2002 and 2003, the operative rule was exactly the same but was designated as Rule 901.18. Currently, former Rule 901.17 again has been designated as 901.18 which includes some changes from former Rule 901.17.

of his or her choosing because the partnership may instead choose to exercise its option to buy the units. Lyme Timber can, in effect, veto a limited partner's choice of transferee."

Regarding the term "approval," the trial court remarked that the term was not defined by the regulations, "making it difficult to plainly distinguish under the rules approval from right of first refusal" as well as to determine "whether the partnership agreement or the practice of the partnership guides whether 'approval' is required." It concluded that because "[a]pproval could reasonably refer to whether the limited partnership can block the transfer the limited partner desires to make (by, for example, buying the shares)[,] . . . paragraph 11 of the Partnership Agreement establishes an approval requirement." The trial court determined that even considering DRA's understanding of its own regulations, "the rules are ambiguous," and "[t]he ambiguities must be construed in the petitioners['] favor."

On appeal, DRA argues that the trial court misinterpreted and misapplied the regulations, failed to consider the legislative history of RSA chapter 77 as well as pertinent federal law, afforded no deference to DRA's interpretations of its own rules, and failed to consider germane portions of Lyme's partnership agreement. It contends that under Rules 901.02 and 901.17, "an interest is still transferable even if there is some constraint on transferring it, so long as *prior* member *approval* of the transfer is not required (and as long as the organization will not dissolve)." According to DRA, the right of first refusal clause under paragraph 11(c) in the partnership agreement requires a limited partner only to provide prior notice of, not to gain approval for, the anticipated transfer of units, and "the asserted conditions in the Partnership Agreement [on the transfer of units] do not rise to the level of making the units non-transferable."

■ Initially, we note that by its plain terms Rule 901.03 does not apply to this case because that rule covers only entities *other* than partnerships, *i.e.*, various types of trusts and homeowners or condominium associations. *See* N.H. ADMIN. RULES, Rev 901.03(a). Indeed, the parties do not contend that this rule applies to a limited partnership such as Lyme, but rely upon it for guidance as to the intended meaning of transferable shares under Rule 901.17 and Rule 901.02. However, the trial court appears to have been under the impression that both Rules 901.02 and 901.03 applied to Lyme, and it based its finding of ambiguity in the regulations at least in part on the fact that Rule 901.02 uses the term "transferable" whereas Rule 901.03 uses the term "freely transferable." Because Rules 901.02 and 901.17 are the operative rules governing whether the Lyme partnership interests are transferable, and Rule 901.03 had no application to such interests, we fail to see how the use of a different term in Rule 901.03 renders the applicable

rules ambiguous. Indeed, as DRA points out, the only logical reason for the use of different terms, *i.e.*, "transferable" versus "freely transferable," is to suggest some difference in the *degree* of transferability required between the beneficial interests in those entities covered by each rule, and this dichotomy weighs in favor of the construction of Rules 901.02 and 901.17 advocated by DRA. Thus, while beneficial interests in certain trusts and homeowners and condominium associations must be "freely transferable" for interest and dividend distributions to be taxable to the individual interest-holders, beneficial interests in entities covered by Rule 901.02, including Lyme, need only meet the lower standard of "transferable" (without complete freedom from constraints) for the interest and dividends income to be taxable to the individual interest-holders rather than the entity. *Cf. Winnacunnet Coop. Sch. Dist. v. Town of Seabrook*, 148 N.H. 519, 525-26 (2002) ("When construing a statute [or regulation], we must give effect to all words in a statute and presume that the legislature [or administrative agency] did not enact superfluous or redundant words."). Simply put, we disagree with the trial court that the different terminology in Rules 901.02 and 901.03 renders the regulations ambiguous in a manner that favors the petitioners.

■ We next address the trial court's finding that Rule 901.17, which defines "transferable," is ambiguous in two respects. First, we agree with the trial court that the phrase "by any means" in this rule is ambiguous. As the trial court correctly observed, this phrase could be interpreted to mean either that an interest-holder has to be able to dispose of his shares without approval by at least *one* single means or by *all* possible means in order for the interest to be deemed "transferable." *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 97 (unabridged ed. 2002) (meaning of "any" includes "one, some, or all indiscriminately of whatever quantity"). However, we disagree with the trial court that this ambiguity, which all concede must be construed in favor of the taxpayer, leads to the conclusion that the Lyme interests are not transferable. Whichever construction is placed on the phrase "by any means," we conclude that there are no circumstances under which the disposal of an interest in Lyme requires the "approval" of another member of the partnership because the right of first refusal in the partnership agreement is not the equivalent of an "approval." *See EnergyNorth Natural Gas v. Continental Ins. Co.*, 146 N.H. 156, 159 (2001) (even where language is ambiguous, one reasonable interpretation of insurance policy language must favor insured before policy can be construed to afford coverage); *cf. Appeal of Town of Nottingham*, 153 N.H. 539, 547 (2006) (ambiguity in regulation need not be resolved where neither possible construction supports challenging party's position).

The trial court found that the term "approval" was ambiguous, and that it reasonably could be construed to encompass the right of first refusal granted to the partnership by paragraph 11(c) of the partnership agreement when a limited partner desires to sell his or her partnership interest(s) to someone other than another limited partner or a member of the limited partner's family. The trial court reasoned that the right of first refusal constituted a form of "approval" because, by exercising the right, Lyme had the ability to exercise some degree of control over who would become a member of the partnership. This was error.

■ The common meaning of "approve" includes "to judge and find commendable or acceptable," to "have or express a favorable opinion," to "judge favorably"; and "approval" ordinarily includes "the act of approving." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, *supra* at 106. Nowhere in paragraph 11 of the partnership agreement do the words "approve," "approval," or any similar terms appear. Instead, paragraph 11(c) merely gives Lyme the option, in the case of a proposed transfer to a non-family member of the transferor and to a non-partner, to purchase the partnership interest on the same terms as that transferee has offered. While the ability to exercise this right of first refusal may in some circumstances allow Lyme to block a transfer of partnership shares to a person the partnership finds undesirable, this is not the equivalent of an "approval" as contemplated by the DRA regulations because it does not represent a significant restraint on the ability to alienate partnership interests. See *Larson v. Commissioner*, 66 T.C. 159, 182-83 (1976).

■ Ready transferability of ownership interests has long been regarded as an important consideration in determining the tax status of collective entities. See generally *Morrissey v. Commissioner.*, 296 U.S. 344, 359 (1935). In *Larson*, for example, the United States Tax Court, while recognizing that even a right of refusal at fair market value constituted a modicum of restriction on alienability of a limited partner's interests in the partnerships there at issue, held that "[t]he right of assignment more closely resemble[d] that attending corporate shares than that typically associated with partnership interests. The [limited partnerships] therefore possessed the corporate characteristic of free transferability of interests." *Larson*, 66 T.C. at 183. *Larson* is consistent with the weight of modern authority, which holds that a right of first refusal to match a third party's offer to purchase does not constitute a significant impediment to the transfer of property. See *Bortolotti v. Hayden*, 866 N.E.2d 882, 890 (Mass. 2007) (right of first refusal giving holder right to match any bona fide offer made by third party "works a de minimis restraint on the alienation of property"); *Wildenstein & Co., Inc. v. Wallis*, 595 N.E.2d 828, 834-35 (N.Y.

1992) (New York statutory rule against perpetuities and common law rule against restraints on alienation of property did not invalidate commercial agreement under which art collector gave dealer right of first refusal to purchase certain valuable paintings on same terms offered by third party); *Shiver v. Benton*, 304 S.E.2d 903, 905 (Ga. 1983) (quoting RESTATEMENT OF PROPERTY § 413 (1944) that right of first refusal which gives holder thereof merely the right "to meet the offer of an open market purchaser" is not an unlawful restraint on alienation of real property); *Smurfit-Stone Container Enterprises, Inc. v. Zion Jacksonville, Ltd.*, 52 So. 3d 55, 58-59 (Fla. Dist. Ct. App. 2010) (agreement under which plaintiff had right to make first offer in the event defendant desired to sell real property, but which allowed defendant to either accept offer or sell to third party at a higher price, did not violate Florida's rule against perpetuities because it did not undermine the marketability or discourage improvement of the land); RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES) § 3.3, at 425 (2000) (rule against perpetuities ought not apply to right of first refusal).[3] *But see Ferrero Constr. Co., Inc. v. Dennis Rourke Corp.*, 536 A.2d 1137, 1144 (Md. 1988) (reasoning that right of first refusal which grants holder option to meet offer made by third party violated rule against perpetuities because it had potential to discourage third parties from making offers, which in turn could depress the value).

■ The clear purpose of the regulatory scheme established by the legislature under RSA 77:3 and :4, III, and the implementing regulations, is to hinge taxation of individual holders of a beneficial interest (rather than the entity or organization itself) on the extent to which their interests represent individual as opposed to collective economic value. Because, in order to block transfer to an outsider, Lyme must be prepared to pay the disposing interest-holder the same consideration offered by the outsider, the right of first refusal does not significantly affect the marketability or value of a limited partner's economic interest: whether the purchaser of his

---

[3] In *North Bay Council, Inc. v. Grinnell*, 123 N.H. 321, 324 (1983), we stated that a "strict application" of the rule against perpetuities would invalidate a deed provision which gave the grantor and his heirs or assigns a right of first refusal of unlimited duration to repurchase the subject property from the grantee and its successors by matching the highest bona fide offer made by a third party. However, we noted in that case that the rule had never been "remorselessly applied" in this state, but that, "[i]nstead, we have been more concerned with carrying out the intent of the testator or grantor in any given case." *Id.* More importantly, because in that case the holder of the right of first refusal had been guilty of laches in negligently failing to exercise his right upon the first sale of the property, we had no occasion to consider whether such a right, as properly limited in accordance with our precedents, would constitute a significant impediment to the alienability of property.

or her interest is an outsider or Lyme itself, the interest holder is able to readily liquidate his or her holdings for whatever price the market will bear.

The petitioners seek to avoid application of the above analysis by arguing that, during its thirty-years existence, "every transfer of Units has been subject to the approval of Woodland [Management Associates, Inc., the general partner], acting for Lyme and the Limited Partners." The short answer to this argument is that while Woodland may indeed have gone through the formality of granting "approval" to each and every transfer, the important point is that the partnership agreement gives Woodland no choice but to approve, or, where a transfer is subject to the right of first refusal, to match the bona fide written offer of a third party purchaser. For the reasons already stated, such *ipse dixit* "approvals" do not satisfy the requirements necessary to make the Lyme units non-transferable within the meaning of Rules 901.02 and 901.17.

■ Finally, the petitioners complain that although the DRA regulations have been in effect since 1988, prior to the audit in this case DRA had never sought to collect interest and dividends taxes from individual limited partners rather than from a partnership as an entity. But Lyme does not claim that DRA ever took any affirmative steps that might be viewed as a representation that a limited partnership's treatment of interest and dividends income as taxable to the partnership was proper, and it is well established that no estoppel arises against a governmental agency merely because of its failure to take enforcement action at an earlier time. *See Town of Windham v. Alfond*, 129 N.H. 24, 32 (1986); *City of Concord v. Tompkins*, 124 N.H. 463, 470 (1984); *cf. Anderson v. Motorsports Holdings*, 155 N.H. 491, 499-500 (2007) (mere showing of historical laxity in enforcement is not sufficient to establish conscious, intentional discrimination necessary to bar enforcement of ordinance); *see also Altria Group, Inc. v. Good*, 555 U.S. 70, 89-90 (2008) ("agency nonenforcement of a federal statute is not the same as a policy of approval").

*Reversed and remanded.*

DALIANIS, C.J., and DUGGAN, HICKS and CONBOY, JJ., concurred.