HICKS, J.,
dissenting. It is abundantly clear that none of my four colleagues have spent a summer in East Colebrook, an area where weddings on farms are customary. Today, the majority holds that the trial court properly determined that hosting weddings and like events is not a permitted use in Henniker’s rural residential district. The majority offers two separate and independent rationales for its decision: first, that both the plain language and legislative history of RSA 21:34-a (2012) fail to demonstrate a legislative intent to include “agritourism” in the statutory definition of “agriculture”; and second, that the proposed use is not an accessory use to the petitioner’s farm. Because I disagree with the majority, under both rationales, I would reverse the trial court’s decision. Therefore, I respectfully dissent.
Addressing the majority’s interpretation of RSA 21:34-a first, I would conclude that the language of the statute that defines “agriculture” is ambiguous, at best. Given its placement in a statute titled “Farm, Agriculture, Farming,” which exclusively defines farming and agricultural practices, it seems unlikely that the legislature would include the definition of “agritourism” without intending it to be considered part of farming or agriculture. See RSA 21:34-a. This conclusion is strengthened from the fact that the definition of “agritourism” includes certain activities that would constitute agriculture. See RSA 21:34-a, VI. For example, the statute defines “agritourism” to include “attracting visitors to a working farm for the purpose of . . . active involvement in the activity of the farm which is ancillary to the farm operation.” Id. Paragraph II of RSA 21:34-a defines the activities and practices which constitute agriculture and includes “all operations of a farm” as the basis for those definitions. RSA 21:34-a, II (2012). Therefore, any agritourism activity that is “ancillary to the farm operation” would constitute agriculture pursuant to paragraph II, especially such activities that require “active involvement in the activity of the farm.” RSA 21:34-a, II, VI (2012). Nevertheless, I recognize that the majority’s interpretation of the statute is also reasonable and, thus, to *761 resolve the ambiguity we must look to the legislative history to determine the legislature’s intent. See United States v. Howe, 167 N.H. 143, 148-49 (2014).
When we interpret statutes, we do so “in light of the policy or purpose sought to be advanced by the statutory scheme.” Montenegro v. City of Dover, 162 N.H. 641, 644-45 (2011). The provision defining “agritourism” began as a recommendation from a New Hampshire Farm Viability Task Force (Task Force). See CULTIVATING SUCCESS ON NEW HAMPSHIRE Farms: The New Hampshire Farm Viability Task Force Report 41 (2006) available at http://agriculture.nh.gov/publications-forms/documents/ farm-viability-report.pdf. The Task Force was established in response to 2005 Senate Concurrent Resolution No. 1, which recognized that “farming and other agricultural interests are a vital part of New Hampshire’s economy” and that “there are laws, rules, and regulations ... hindering the economic viability of New Hampshire farms.” S. CON. Res. 1, 2005 Sess. (N.H. 2005). The resolution recommended a task force to examine, in relevant part, methods for “[promoting and expanding agricultural based tourism, community supported agriculture, farmers’ markets, farm stands, agricultural fairs, the horticulture industry, and pick-your-own enterprises.” Id.
The Task Force made three findings relevant to the issue of agritourism: (1) “farmers can’t be expected to continue to operate viable farm businesses if the economically sensible behavior is to sell the land,” CULTIVATING SUCCESS, supra at 9; (2) “farm businesses that have been able to sell innovative products[, processes, or services] have seen greater growth opportunities,” CULTIVATING SUCCESS, supra at 8; and (3) “[t]oday’s . . . farmers now face [the challenges of] the vagaries of local zoning boards, failure to be compensated for the public benefit they provide to the environment, and uncertain regulatory barriers,” CULTIVATING SUCCESS, supra at 10. To address the concerns raised by these findings, the Task Force recommended “[r]emov[ing] rules and regulations burdensome to agriculture” and adopting “[a] uniform definition of farming (as best described in RSA 21:34-a) that is consistent throughout state law and used by local land use boards.” Id. at 36-37. Adding a definition of “agritourism”[1] to RSA 21:34-a was one of the proposed legislative actions to eliminate burdensome, confusing, or conflicting laws. Id. at 40-41. The clear purpose of this recommendation was to incorporate agritourism into the definition of “agriculture” and create a uniform definition to be used across the State.
*762 Furthermore, these concerns and goals were re-emphasized at the public hearing before the Senate committee. There, Gail McWilliam Jellie, Director of Agricultural Development of the New Hampshire Department of Agriculture, testified that “the income generated directly from [agritourism] activities ... [is] important in the operation of the farm business,” “and including agritourism in the state’s definition of agriculture shows that New Hampshire recognizes the contribution to the industry and gives these activities credibility.” RELATIVE TO THE DEFINITION OF AGRITOURISM: Hearing on H.B. 56 before the Sen. Comm, on Energy, Env’t and ECON. Dev. 7 (Apr. 10, 2007). This sentiment was echoed by Robert Johnson, Director of the New Hampshire Farm Bureau Federation, who testified that “[w]e look at [agritourism] as enhancing farm viability through the opportunity created in what is today agriculture in New Hampshire____It’s a value-added service or an experience; that’s where the profit is in agriculture in New Hampshire.” Id. at 10-11. Accordingly, in light of the legislative history, I would conclude that to give full effect to the policy and purpose of the new “agritourism” definition, “agritourism” must be considered agriculture.
Including “agritourism” in the definition of “agriculture” does not mean, however, that the petitioner automatically prevails. Although the majority avoids the question of whether the petitioner’s proposed activities constitute agritourism, for the petitioner to succeed he must demonstrate that his proposed uses fall within that definition. Paragraph VI of RSA 21:34-a includes as agritourism “enjoyment of the farm environment.” RSA 21:34-a, VI. Frankly, I fail to see how hosting a wedding or any event in a tent overlooking or within the Christmas tree grove fails to constitute “enjoyment of the farm environment,” especially when the petitioner goes to great lengths to incorporate elements of the farm into the space through such acts as using an altar made of balsam fir boughs. To the extent that the respondent and intervenors may argue that the income produced by the events exceeds that of the Christmas tree farm itself, I conclude that argument is irrelevant as it is not addressed by the statute and the legislature explicitly declined to craft such limitations. See id.; HEARING ON H.B. 56, supra at 19-20 (declining to define a limit to agritourism activities). Nor does the statute prohibit the State or a municipality from enforcing generally applicable laws and ordinances governing such issues as noise, parking, or safety. HEARING ON H.B. 56, supra at 3-4 (statement of Sen. Joseph Kenney). Thus, I conclude that RSA 21:34-a includes agritourism as part of the definition of agriculture and that the petitioner’s proposed activities constitute agritourism. Accordingly, I would reverse the decision of the trial court on this basis.
*763 Addressing the issue of accessory use next, I agree with the majority that: (1) the accessory use must be occasioned by the principal use and subordinate to it, see Fox v. Town of Greenland, 151 N.H. 600, 606 (2004); (2) Henniker’s definition of accessory use, “use subordinate and customarily incidental to the main . . . use on the same lot,” is consistent with our common law definition; and (3) to be “incidental” and “subordinate,” a use must be minor in relation to the primary use and bear a reasonable relationship to that use.
The accessory use doctrine functions as a response to the impossibility of providing expressly by zoning ordinance for every possible lawful use. Town of Salem v. Durrett, 125 N.H. 29, 32 (1984). When a given use of land is not explicitly allowed, it is nonetheless permissible if it may be said to be accessory to a use that is expressly permitted. Id. The most frequently litigated requirement of accessory use is the meaning of customary, see Smith, Note, Zoning: Accessory Uses and the Meaning of the “Customary” Requirement, 56 B.U.L. Rev. 542, 543 (1976), and setting a cogent definition of “customary” is a task that has routinely confounded courts since the adoption of the accessory use doctrine, see, e.g., State v. Smiley, 153 N.W.2d 906, 908 (Neb. 1967) (“[W]hat does ‘customarily’ mean, and to what geographical area should the test be applied?”); Jantausch v. Borough of Verona, 124 A.2d 14, 20 (N.J. Super. Ct. Law Div. 1956), aff'd, 131 A.2d 881 (N.J. 1957) (“What would ‘customary’ mean in the present setting? ... Is ‘customary’ to be measured by reference to the state or to a more restricted area, perhaps the borough itself? And is ‘customary’ a mathematical concept in this context. . . ?”).
Commentators have concluded that “[i]n determining whether a use is customary, courts may examine the entire community, or the general region, or even nationwide trends in an industry.” 2 E. Yokley, ZONING Law and Practice § 8-3, at 8-5 (4th ed. 2009) (footnotes omitted); see also 7 P. Rohan, Zoning and Land Use Controls § 40A.03[3][c][iii], at 40A-32 (2012). Some jurisdictions, in fact, determine whether a proposed accessory use is customary using any of the three potential geographic limitations, without any particular rationale behind the choice. Compare, e.g., Appeal of Lord, 81 A.2d 533, 536 (Pa. 1951) (examining customary aspect of accessory use based on national trends), with Gross v. Zoning Board of Adjustment of City of Phila., 227 A.2d 824, 826 (Pa. 1967) (examining customary aspect of accessory use based on trends -within a municipality), and Gold v. Zoning Board of Adjustment, 143 A.2d 59, 60 (Pa. 1958) (examining customary aspect of accessory use based on an indeterminate standard). In New Hampshire, we do not utilize a single geographic limitation in determining whether a proposed accessory use is customary. See, e.g., Marchand v. Town of Hudson, 147 N.H. 380, 384 (2001) (examining customary aspect of *764 accessory use based on similar activity within the municipality); Nestor v. Town of Meredith, 138 N.H. 632, 634 (1994) (examining customary aspect of accessory use based on unspecified geographic limit); Durrett, 125 N.H. at 33 (referencing evidence from areas outside the municipality to support its analysis of the customary aspect of accessory use); Becker v. Town of Hampton Falls, 117 N.H. 437, 441 (1977) (examining customary aspect of accessory use based on activity within the municipality); see also Town of Windham v. Alfond, 129 N.H. 24, 29 (1986) (stating that the trial court could take notice of changing conditions in a portion of the state and infer that traditional rural stereotypes were no longer applicable to the area).
In Durrett, the issue was whether “use of an airstrip was ... customarily associated with residential use.” Durrett, 125 N.H. at 33. We observed that the trial court had considered testimony that “seaplanes had frequently landed at a pond located in a recreational zoning district in Salem.” Id. (emphasis added). In our review of the trial court’s decision, we concluded that the trial court could have reasonably found that use of an airstrip was not customarily associated with residential use because “there was no evidence to the contrary before the district court.” Id. Nevertheless, we did consider evidence that arose after the appeal had been filed regarding one household in another town that had been permitted to maintain a private landing strip. Id. We explained that “[o]ne instance in another town does not rise to the level of custom.” Id. Accordingly, I agree with the petitioner that our decision in Durrett clarified that Becker did not establish rigid requirements for determining whether a use is customary.
In Alfond, the issue was whether “use of... residentially zoned property for the stabling and pasturing of horses kept for . . . personal recreation” constituted an accessory use. Alfond, 129 N.H. at 26. We observed that at trial there had been testimony stating that “during the past twenty years only six owners of Windham properties in residential zones had . . . kept horses.” Id. at 29. Although this would suggest that we made our determination solely by looking at activities within the municipality, we also observed that “the trial court could properly take notice, N.H.R. Ev. 201(a), that Windham is in a portion of the State under pressure of residential crowding . .. from which the court could reasonably infer that traditional rural stereotypes are no longer sound indications of actual conditions in the area.” Id. In making that observation, we held that the trial court could properly consider, as evidence, regional tradition and changing demographics in a region of the state when considering whether an accessory use is customary. Id. Accordingly, I believe our holding in Alfond further clarified our holding in Becker.
Furthermore, I believe limiting the inquiry to only the local area defies the very purpose behind the accessory use doctrine. Limiting the custom *765 ary inquiry to the local area creates situations where, due to insufficient data, establishing customary use would be impossible. This is particularly true in smaller towns, such as Henniker. “The purpose of accessory use provisions is to permit uses that are necessary, expected or convenient in conjunction with the principal use of the land.” ROHAN, supra § 40A.01, at 40A-3. Commentators and jurists have recognized that:
The difficulty with the requirement that a use be customary is that, literally applied, it would-establish a class closed to uses not in existence at the time of the enactment of the ordinance. . ..
Yet this narrow view of the customary requirement is not necessarily the one intended. . . . The purpose in choosing the word “customary” seems to have been evidentiary. It was designed to give examples of the kinds of uses that were acceptable but not necessarily to close the class of possible uses.
Id. § 40A.03[3][a], at 40A-26 to 40A-27; see also 2 E. ZIEGLER, JR., Rathkopf’s the Law of Zoning and Planning § 33.3, at 33-12 (2012) (“Naturally, the perception of which accessory uses are considered ‘customary’ changes with the times.”); Dellwood Dairy Co. v. City of New Rochelle, 165 N.E.2d 566, 567 (N.Y. 1960) (“It is a common experience that new times bring... new ways of dealing with old [problems].”). Accordingly, a narrow construction of the customary requirement would mean “that only those already prevalent uses would be permitted.” Smith, supra at 546. The result of such a construction “would be unacceptable stagnancy.” Id. This stagnancy is the antithesis of the accessory use doctrine’s purpose.
Rejecting this limitation, however, does not change the requirement that “the uses must be associated with a frequency that is substantial enough to rise above rarity.” Alfond, 129 N.H. at 29. Although the majority concludes that the petitioner’s evidence of farms in New Hampshire that host weddings and similar events is insufficient, I would conclude otherwise because he needs to demonstrate that such use “rise[s] above rarity,” Alfond, 129 N.H. at 29, which he has done.
Furthermore, the record reflects that agritourism, generally, is “associated with a frequency that is substantial enough to rise above rarity.” Id. The 2007 United States Census of Agriculture found that across the country 23,350 farms indicated that they provided agritourism and recreation services valued at $566 million.[2] United States Department of *766 Agriculture, 2007 Census of Agriculture 15 (2009) (table of income from farm-related sources), available in appellant’s appendix, volume I at 109.
Within New Hampshire, Director Jellie, in her testimony before the Senate committee, cited a recent study conducted by Plymouth State University which found that “about a third of agriculture’s total $935 million contribution to New Hampshire’s economy is due to agritourism activities.” HEARING ON H.B. 56, supra at 6. This substantial relationship between agriculture and agritourism in both New Hampshire and across the country is sufficient to conclude that agritourism activities occur “with a frequency that is substantial enough to rise above rarity.” Alfond, 129 N.H. at 29. Accordingly, I would conclude that agritourism is an accessory use.
This result would not provide the petitioner with a free hand to operate an event-hosting business under the false premise of a Christmas tree farm, as many throughout the proceedings in this case have alleged. Under the accessory use doctrine, an accessory use must be subordinate to the primary use. See Fox, 151 N.H. at 606. Although no bright-line rule exists for determining whether a use is subordinate, once the accessory use ceases to be subordinate to the primary use it ceases to be permissible. See KSC Realty Trust v. Town of Freedom, 146 N.H. 271, 274 (2001) (explaining that the definition of subordinate can shift depending on various factors). The agritourism definition limits agritourism activities because any such activity must have some connection to the farm, even if it is simply enjoyment of the farm environment. See RSA 21:34-a, VI. Permitting the occasional wedding or other event at the petitioner’s farm is not a slippery slope. Rather, it protects the rural traditions of New Hampshire. Accordingly, I would reverse the decision of the trial court.
For these reasons, I respectfully dissent.

 The original language proposed by the Task Force was “Agritourism: based on attracting visitors to farm operations for the purpose of eating a meal, making overnight stays, enjoyment, education or active involvement in the activity of the farm or operation.” Cultivating Success, supra at 41.

 Although it is not in the record before us, I note that the 2012 Census of Agriculture found that agritourism has increased across the country with 33,161 farms providing agritourism and recreation services valued at $704 million. 1 United States Department of Agriculture, 2012 CENSUS OF Agriculture 15 (2014) (table of income from farm-related sources).