NOTICE:  This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press.  Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Merrimack
No. 2013-893


STEPHEN E. FORSTER D/B/A FORSTER'S CHRISTMAS TREE FARM & GIFT SHOPPE

v.

TOWN OF HENNIKER

Argued:  February 19, 2015
Opinion Issued:  June 12, 2015

Sheehan, Phinney, Bass & Green, P.A., of Manchester (Robert H. Miller on the brief and orally), for the petitioner.


Upton & Hatfield, LLP, of Concord (Barton L. Mayer on the brief and orally), for the respondent.


Michael L. Donovan, of Concord, by brief and orally, for the intervenors.

DALIANIS, C.J.  The petitioner, Stephen E. Forster d/b/a Forster's Christmas Tree Farm & Gift Shoppe, appeals a decision of the Superior Court (Smukler, J.) upholding the determination by the zoning board of adjustment (ZBA) for the respondent, the Town of Henniker (Town), that "weddings [and]

like events are not accessory uses" to the petitioner's farm and that hosting such events is not a permitted use in the farm's zoning district. Because we conclude that the petitioner has not established, as he argues, that he has a right to conduct commercial weddings and similar events on his farm, without obtaining either a special exception or a variance, we affirm.

I. Background

The trial court recited, or the record supports, the following facts. The petitioner owns approximately 110 acres in Henniker on which he operates a commercial Christmas tree farm. His Christmas trees occupy approximately 10 acres of the farm. The intervenors, Stephen and Spencer Bennett, own property that abuts the petitioner's property.

The petitioner's property is in the rural residential district. The Town's zoning ordinance provides that the rural residential district includes "a mixture of agriculture and low-density rural living outside of the built-up districts of the community where public water and sewer services are not generally available." The ordinance states that "[t]he low-density open areas complement and encourage agricultural uses that are characteristic of the town." The ordinance lists agriculture and uses accessory to a permitted use as two of the uses permitted in the district. Uses allowed by special exception include "Home business/retail" and "Bed & Breakfast Homes." The ordinance also provides that, in the rural residential district, "[n]o more than two home businesses shall be permitted per lot at any one time[,] provided . . . that adequate off-street parking is provided on the premises."

The zoning ordinance defines the word "agriculture" as: "See New Hampshire Revised Statute Annotated Chapter 21:34-a Farm, Agriculture, Farming." This definition was added to the ordinance in 2005. A "commercial Christmas tree operation" is included in the definitions of "agriculture" and "farming" pursuant to RSA 21:34-a, II(a)(11) (2000) (amended 2006, 2008). Accordingly, the petitioner's Christmas tree farm is a permitted use in the rural residential district.

In addition to operating a Christmas tree farm, the petitioner uses his property for weddings, celebrations, and business and educational events. The petitioner makes his property available for these commercial events between May and October. The venue has a maximum capacity of 150 people. In 2011, the petitioner held eight events; in 2012, he held five events.

In May 2012, the Town planner issued a notice of violation to the petitioner, informing him that "operating a wedding/reception function facility" is not permitted in the rural residential district. The notice of violation was stayed until September 4, 2012. On that day, the petitioner appealed the notice of violation to the ZBA.

2

The ZBA held public hearings upon the petitioner's appeal in October and November 2012. In November 2012, the ZBA unanimously determined that, contrary to the petitioner's arguments, weddings and similar events are not accessory uses to his primary agricultural use. However, in a 4-1 decision, the ZBA decided that weddings and civil union ceremonies are allowed in the rural residential district as permitted uses.

Thereafter, the ZBA granted the motions for rehearing filed by the petitioner and the intervenors and, in February 2013, heard the petitioner's appeal de novo. The petitioner asserted that his permitted proposed uses included "gatherings, meetings, celebrations, retreats and educational opportunities for families, schools and colleges, businesses and charitable or non-profit organizations which use the unique agricultural or farm setting." In a 4-1 decision, however, the ZBA concluded that the petitioner's proposed uses, including weddings and civil union ceremonies, were not accessory uses, and the ZBA voted 3-2 that said uses were not permitted in the rural residential district. The petitioner unsuccessfully moved for rehearing and then appealed to the superior court. After the superior court upheld the ZBA's decision, the petitioner appealed to this court.

II. Discussion

Judicial review in zoning cases is limited. Brandt Dev. Co. of N.H. v. City of Somersworth, 162 N.H. 553, 555 (2011). Factual findings by the ZBA are deemed prima facie lawful and reasonable, and the ZBA's decision will not be set aside by the superior court absent errors of law unless it is persuaded by the balance of probabilities, on the evidence before it, that the ZBA decision is unlawful or unreasonable. Id.; see RSA 677:6 (2008). We will uphold the superior court's decision unless the evidence does not support it or it is legally erroneous. Brandt Dev. Co. of N.H., 162 N.H. at 555.

A. Whether the Proposed Uses are Permitted in the Rural Residential District

1. Plain Meaning of RSA 21:34-a

The petitioner first argues that his proposed uses are permitted uses in the rural residential district because: (1) they constitute "agritourism" under RSA 21:34-a, VI (2012); (2) "agritourism" is included in the definition of "agriculture" in RSA 21:34-a (Supp. 2014); and (3) the Town's ordinance incorporates by reference the definition of "agriculture" in RSA 21:34-a. Alternatively, he asserts that, to the extent that the Town's ordinance precludes his proposed uses in the rural residential district, the ordinance is impliedly preempted by state law. See Prolerized New England Co. v. City of Manchester, 166 N.H. 617, 623 (2014) (explaining that implied preemption exists when State and local regulation conflict, when a local regulation frustrates a statute's

3

purpose, or when the comprehensiveness and detail of the State statutory scheme evinces legislative intent to supersede local regulation).

The interpretation of a statute is a question of law, which we review de novo. Clare v. Town of Hudson, 160 N.H. 378, 384 (2010). In matters of statutory interpretation, we are the final arbiters of the legislature's intent as expressed in the words of the statute considered as a whole. Id. When examining the language of a statute, we ascribe the plain and ordinary meaning to the words used. Id. Unless we find statutory language to be ambiguous, we will not examine legislative history. Id. at 384-85. In construing a statute, we will neither consider what the legislature might have said nor add words that it did not see fit to include. Id. at 385. These same rules of construction apply to zoning ordinances. Id.

For the purposes of addressing the petitioner's arguments, we assume, without deciding, that his proposed uses constitute "agritourism" and that the Town's ordinance incorporates by reference the definition of "agriculture" contained in RSA 21:34-a. However, we disagree with him that "agritourism" is included in the statutory definition of "agriculture."

RSA 21:34-a provides:

**21:34-a Farm, Agriculture, Farming.**

I. The word "farm" means any land, buildings, or structures on or in which agriculture and farming activities are carried out or conducted and shall include the residence or residences of owners, occupants, or employees located on such land . . . .

II. The words "agriculture" and "farming" mean all operations of a farm, including:

   (a)(1) The cultivation, conservation, and tillage of the soil.

   (2) The storage, use of, and spreading of commercial fertilizer, lime, wood ash, sawdust, compost, animal manure, septage, and, where permitted by municipal and state rules and regulations, other lawful soil amendments.

   (3) The use of and application of agricultural chemicals.

   (4) The raising and sale of livestock . . . .

   (5) The breeding, boarding, raising, training, riding instruction, and selling of equines.

4

(6) The commercial raising, harvesting, and sale of fresh water fish or other aquaculture products.

(7) The raising, breeding, or sale of poultry or game birds.

(8) The raising of bees.

(9) The raising, breeding, or sale of domesticated strains of fur-bearing animals.

(10) The production of greenhouse crops.

(11) The production, cultivation, growing, harvesting, and sale of any agricultural, floricultural, viticultural, forestry, or horticultural crops including, but not limited to, . . . Christmas trees grown as part of a commercial Christmas tree operation . . . .

(b) Any practice on the farm incident to, or in conjunction with such farming operations, including, but not necessarily restricted to:

(1) Preparation for market, delivery to storage or to market, or to carriers for transportation to market of any products or materials from the farm.

(2) The transportation to the farm of supplies and materials.

(3) The transportation of farm workers.

(4) Forestry or lumbering operations.

(5) The marketing or selling at wholesale or retail, on-site and off-site, where permitted by local regulations, any products from the farm.

(6) Irrigation of growing crops from private water supplies or public water supplies where not prohibited by state or local rule or regulation.

(7) The use of dogs for herding, working, or guarding livestock, as defined in RSA 21:34-a, II(a)(4).

(8) The production and storage of compost and the materials necessary to produce compost, whether such materials originate, in whole or in part, from operations of the farm.

5

III.  A farm roadside stand shall remain an agricultural operation and not be considered commercial, provided that at least 35 percent of the product sales in dollar volume is attributable to products produced on the farm or farms of the stand owner.

IV.  Practices on the farm shall include technologies recommended from time to time by the university of New Hampshire cooperative extension, the New Hampshire department of agriculture, markets, and food, and appropriate agencies of the United States Department of Agriculture.

V.  The term "farmers' market" means an event or series of events at which 2 or more vendors of agricultural commodities gather for purposes of offering for sale such commodities to the public. Commodities offered for sale must include, but are not limited to, products of agriculture, as defined in paragraphs I-IV.  "Farmers' market" shall not include any event held upon any premises owned, leased, or otherwise controlled by any individual vendor selling therein.

VI.  The term "agritourism" means attracting visitors to a working farm for the purpose of eating a meal, making overnight stays, enjoyment of the farm environment, education on farm operations, or active involvement in the activity of the farm which is ancillary to the farm operation.

(Emphases added.)

The statute defines the words "farm," "agriculture," "farming," "farmers' market," and "agritourism."  Paragraph I defines "farm."  Under that paragraph, "farm" refers to the "land, buildings, or structures" on which "agriculture and farming" take place.  RSA 21:34-a, I.  Paragraph II defines "agriculture" and "farming."  It consists of two subparts.  Subpart (a) explains that the two words "mean all operations of a farm" and subpart (b) explains that they also refer to "[a]ny practice on the farm" that is incidental to or conducted "in conjunction with" farm operations.  Although growing "Christmas trees . . . as part of a commercial Christmas tree operation" is listed as a farm operation under subpart (a), hosting events such as those the petitioner proposes is not.  RSA 21:34-a, II(a).

Hosting such events also is not included in subpart (b) as a practice incidental to farming operations.  Although subpart (b) states that its list of practices is not all inclusive, under the principle of ejusdem generis, we construe the general words in that subpart ("[a]ny practice on the farm incident to, or in conjunction with such farming operations") to embrace only practices similar to those included in the enumerated list.  See In the Matter of

6

<u>Hennessey-Martin & Whitney</u>, 151 N.H. 207, 211 (2004). Hosting events such as the petitioner proposes is not similar in nature to the practices listed in subpart (b).

Paragraph III of the statute pertains to "farm roadside stand[s]" and provides that they are deemed to be "agricultural operation[s]" provided that "at least 35 percent of the product sales in dollar volume is attributable to products produced on the farm or farms of the stand owner." RSA 21:34-a, III. Otherwise, farm roadside stands are deemed to be commercial operations. <u>See</u> <u>id</u>.

Paragraph IV provides that "[p]ractices on the farm shall include technologies" recommended by certain entities. Thus, under paragraph IV, such technologies are among the practices included in Paragraph II(b).

Paragraph V pertains to farmers' markets. Pursuant to this paragraph, to be a "farmers' market," the event or series of events must have "2 or more vendors of agricultural commodities . . . offering for sale such commodities to the public." RSA 21:34-a, V. The term does "not include any event held upon any premises owned, leased, or otherwise controlled by any individual vendor selling therein." <u>Id</u>.

Paragraph VI defines the term "agritourism." Pursuant to this paragraph, to constitute "agritourism," the activity must "attract[ ] visitors to a working farm for the purpose of eating a meal, making overnight stays, enjoyment of the farm environment, education on farm operations, or active involvement in the activity of the farm," and an activity must be "ancillary to the farm operation." RSA 21:34-a, VI. However, nothing in this definition provides that activities that constitute "agritourism" also constitute "agriculture." <u>See</u> RSA 21:34-a, II, VI.

Accordingly, even if we assume that the petitioner's proposed uses constitute "agritourism," the plain meaning of RSA 21:34-a does not provide that they also constitute "agriculture." Of course, if the legislature disagrees with our statutory interpretation, it is free to amend the statute as it sees fit. <u>See</u> <u>Appeal of Town of Nottingham</u>, 153 N.H. 539, 566 (2006).

The petitioner contends that RSA 674:44-e (2008) evinces legislative intent to include "agritourism" within the definition of "agriculture." His reliance upon RSA 674:44-e is misplaced. RSA 674:44-e provides:

> An agricultural commission may be established in accordance with RSA 673 for the proper recognition, promotion, enhancement, encouragement, use, management, and protection of agriculture and agricultural resources, tangible or intangible, that are valued for their economic, aesthetic, cultural, historic, or community

7

significance within their natural, built, or cultural contexts.  The word 'agriculture' shall include the entirety of RSA 21:34-a, which is the definition of farm, agriculture, and farming.

The statute applies when a town establishes an agricultural commission.  Under that statute, the legislature has authorized municipal agricultural commissions to advance "agriculture," broadly defined to include "the entirety of RSA 21:34-a."  However, RSA 674:44-e does not change the plain meaning of RSA 21:34-a.  As we have previously discussed, RSA 21:34-a does not include "agritourism" in the definition of "agriculture."

### 2.  Legislative History of RSA 21:34-a

Because we conclude that, pursuant to its plain language, RSA 21:34-a does not include "agritourism" in its definition of "agriculture," we need not consult legislative history to aid in our analysis.  However, even when we consult such history, we conclude that it supports our statutory construction.

Paragraph VI of RSA 21:34-a, which defines "agritourism," was added to RSA 21:34-a in 2007, pursuant to House Bill (HB) 56.  See Laws 2007, ch. 157.  As introduced, HB 56 defined "agritourism" as "attracting visitors to farm operations for the purpose of eating a meal, making overnight stays, enjoyment, education, or active involvement in the activity of the farm or operation."  House Bill 56 available at http://gencourt.state.nh.us/SofS_Archives/2007/house/HB56H.pdf.  Thereafter, the House Committee on Resources, Recreation and Development recommended amending HB 56 to define "agritourism" as "attracting visitors to farm operations for the purpose of eating a meal, making overnight stays, enjoyment, education, or active involvement that is ancillary to the activity of the farm or operation, and as such shall be considered an agricultural use."  N.H.H.R. Jour. 107 (2007) (emphasis added).  The committee explained that the intent of HB 56, as amended, was to "define[ ] agritourism as those ancillary farm activities, such as wagon rides and[/]or mazes, used to attract visitors to farms."  Id.  According to the committee, the intent of the bill was "to recognize that today's farms need to engage in a diversity of agriculturally[-] related activities to survive."  Id.  The committee reported that the bill had "little impact on a municipality's zoning powers over land uses on farms."  Id.  The House approved the amended version of HB 56.  Id. at 120.

In the Senate, the bill, as amended by the House, was referred to the Senate Committee on Energy, Environment and Economic Development.  N.H.S. Jour. 269 (2007).  At the public hearing before the Senate committee, Representative Jim Martin spoke against the amended bill, explaining that he was concerned that the House had added the phrase "and as such shall be considered an agricultural use."  See Relative to the Definition of Agritourism: Hearing on H.B. 56 Before the Sen. Comm. on Energy, Env't and Econ. Dev. 14

8

(Apr. 10, 2007) (statement of Rep. Jim Martin), <u>available at</u> http://gencourt.state.nh.us/SofS_Archives/2007/senate/HB56S.pdf. He explained:

> The problem is that "agricultural use" is a term of art in zoning and in land use. When towns zone, they zone for uses; they zone industrial uses, they zone commercial uses, residential uses, and agricultural uses. And Brookfield is zoned, as Senator Kenney said, entirely residential/agricultural. And we rely on the definitions that are in the statute that you have before you: [RSA] 21:34-a. So we think we know what "agriculture" means, all right, 'cause it's well defined. But this, in my view, and the pernicious effect of this, and I don't think it was intended, but the effect of this I think is to preempt all local zoning ordinances. Because this now says restaurants and motels, hotels are agricultural uses permitted in any agricultural zone. And I think we should not do that.

<u>Id</u>. at 15. Representative Martin suggested that, to address his concern, the phrase "and as such, shall be considered an agricultural use" be deleted from the bill. <u>Id</u>. at 16. He observed that when the bill was first introduced, it did not include this phrase, and "pretty accurately copied . . . Recommendation 5, Proposal 5" from the report of the New Hampshire Farm Viability Task Force. <u>Id</u>. He observed that the "[mistake] came in . . . when they made all these things agricultural uses." <u>Id</u>. In his opinion, doing so created "a real problem." <u>Id</u>.

A representative from the New Hampshire Municipal Association agreed with Representative Martin's concern and with his suggestion of eliminating the phrase "and as such shall be considered an agricultural use." <u>See id</u>. at 18 (statement of Judy Silva, New Hampshire Municipal Association). She stated that, in her opinion, "if you have something that is defining something as an agricultural use, I think you are going to, in some people's minds, be automatically including that in that zone . . . ." <u>Id</u>. The chair of the committee stated that the committee expected the representative from the New Hampshire Municipal Association to recommend "some slightly different language that would address and answer" the concerns raised. <u>Id</u>.

After the hearing, the committee proposed an amendment to HB 56 pursuant to which "agritourism" would be defined as "attracting visitors to a working farm for the purpose of eating a meal, making overnight stays, enjoyment of the farm environment, education on farm operations, or active involvement in the activity of the farm which is ancillary to the farm operation." <u>N.H.S. Jour.</u> 795 (2007). As proposed by the committee, HB 56 would no longer state that "agritourism," as defined in that bill, "shall be considered an 'agricultural use.'" <u>Id</u>. Senator Bob Odell explained that the amendment "was

9

deemed necessary after concerns were raised [about] original language that classified agritourism as an agricultural use, a phrase that could cause local zoning problems." Id. The Senate approved the proposed amendment. Id. at 796. The House then concurred in the Senate amendment, see N.H.H.R. Jour. 866 (2007), and the amended bill was signed into law by the Governor and enacted as RSA 21:34-a, VI. See Laws 2007, ch. 157.

Although the petitioner relies, in part, upon a February 7, 2013 letter written to the ZBA by Senator Odell regarding his opinion, in 2013, about the intent of the Senate committee in 2007, the letter is not part of the legislative history of HB 56, and, thus, is not evidence of legislative intent. See State v. Mullen, 119 N.H. 703, 709 (1979) (concluding that court cannot rely upon statements made by legislators after passage of bill regarding the motives of members in enacting the law); see also 2A N. Singer & J.D. Singer, Statutes and Statutory Construction § 48:16 (7th ed. 2007); U.S. Steel Min. Co., LLC v. Director, OWCP, 719 F.3d 1275, 1283 n.9 (11th Cir. 2013) (explaining that a United States Senator's post-enactment statement "does not constitute legitimate legislative history"); McGee v. Stone, 522 A.2d 211, 216 (R.I. 1987) (deciding that affidavit of legislative co-sponsor of certain legislation was of "no value" because "[p]ostenactment statements of legislators relating to legislative intent . . . are not part of the legislative history of the original enactment").

The legislative history of HB 56 reveals that the legislature considered, but ultimately rejected, the notion that "agritourism," as defined by RSA 21:34-a, VI, constitutes "agriculture" within the meaning of RSA 21:34-a, II. See Singer & Singer, supra § 48:4, at 563-64 ("[W]here the language under question was rejected by the legislature and thus not contained in the statute it provides an indication that the legislature did not want the issue considered."). Thus, the legislative history demonstrates that the plain language of the statute is in accord with the legislature's intent.

### 3. Implied Preemption

"The preemption doctrine flows from the principle that municipal legislation is invalid if it is repugnant to, or inconsistent with, State law." Town of Carroll v. Rines, 164 N.H. 523, 528 (2013) (quotation omitted). "Preemption may be express or implied." Id. (quotation omitted). Here, the petitioner argues implied preemption. Implied preemption may be found when the comprehensiveness and detail of the State statutory scheme evinces legislative intent to supersede local regulation. Id. State law also impliedly preempts local law when there is an actual conflict between the two. Id. A conflict exists when a municipal ordinance or regulation permits that which a State statute prohibits or vice versa. Id. Moreover, even when a local ordinance does not expressly conflict with a State statute, it will be preempted when it frustrates the statute's purpose. Id. Because preemption "is essentially a matter of statutory interpretation and construction," Bond v. Martineau, 164 N.H. 210,

213 (2012), whether a State statute preempts local regulation is a question of law, which we review de novo, Rines, 164 N.H. at 528.

The petitioner argues that the Town's ordinance is impliedly preempted because, in prohibiting his proposed uses, which he contends meet the statutory definition of "agritourism," the ordinance frustrates the purpose of RSA 21:34-a, VI, which, he asserts, is to "creat[e] a uniform understanding of the term[ ] and a uniform application of that term across the state to enhance the economic viability of New Hampshire farms." Relying upon Senator Odell's 2013 letter, he contends that the legislature intended "agritourism" to be "interpreted to give farmers the maximum possible latitude to support their agricultural activities with a wide range of supplemental events and activities to help them remain economically viable." (Quotation omitted.) He asserts that the statutory definition of "agritourism" mandates that the Town "cannot . . . prohibit otherwise valid agritourism enterprises that meet the statutory definition."

RSA 21:34-a is a set of definitions, not a comprehensive statutory scheme aimed at superseding local regulation. Cf. Bio Energy v. Town of Hopkinton, 153 N.H. 145, 152-53 (2005) (holding that RSA chapter 125-C, which consists of twenty-one sections defining and establishing in detail a statewide permitting program to monitor ambient air quality throughout the State, constitutes a comprehensive and detailed regulatory scheme preempting the field of air pollution control in this State). RSA 21:34-a, VI merely defines "agritourism." See generally RSA 425:2-a, I (Supp. 2014) (referring to the State's policy, through its department of agriculture, of supporting "local food producers" and businesses engaged in "agriculture . . . and . . . agritourism"). RSA 21:34-a, VI contains no mandate to municipalities. It does not require that municipalities adopt the same definition. Nor does it mandate that municipalities allow activities that meet the statutory definition of "agritourism." The other provisions in RSA 21:34-a likewise contain no mandate to municipalities. Because RSA 21:34-a contains no mandate, the Town's ordinance necessarily does not conflict either with its language or its purpose.

Although the petitioner relies upon other statutes which, unlike RSA 21:34-a, do contain some mandates to municipalities, those statutes do not use the word "agritourism." See RSA 674:17, I(i) (Supp. 2014); RSA 672:1, III-b (2008), III-d (Supp. 2014); RSA 674:32-a (2008). RSA 674:17, I(i) merely requires that zoning ordinances "encourage" the preservation of agricultural lands and buildings and the "agricultural operations described in RSA 21:34-a." See RSA 21:34-a, II (defining agricultural operations). RSA 672:1, III-b precludes municipalities from unreasonably limiting "[a]gricultural activities" and from unreasonably interpreting their municipal powers. RSA 672:1, III-d explains that a municipality unreasonably interprets its regulatory powers when it fails "to recognize that agriculture . . . when practiced in

11

accordance with applicable laws and regulations, [is a] traditional, fundamental and accessory use[ ] of land throughout New Hampshire, and that a prohibition upon [that] use[ ] cannot necessarily be inferred from the failure of an ordinance . . . to address [it]."  Consistent with the notion that one cannot necessarily infer that an ordinance prohibits agricultural uses when the ordinance fails to address them, RSA 674:32-a provides that when "agricultural activities are not explicitly addressed with respect to any zoning district or location, they shall be deemed to be permitted there, as either a primary or accessory use, so long as conducted in accordance with . . . federal and state laws, regulations, and rules."

None of these statutes support the petitioner's contention that the legislature intended to <u>require</u> municipalities to allow "agritourism" within their borders.  At most, they evince the legislature's general intent to support traditional agriculture and agricultural activities.  Moreover, they demonstrate legislative intent to <u>allow</u> reasonable local regulation, not to preempt the entire field.  Accordingly, should Town voters want to allow the petitioner's proposed uses in the rural residential district, they are free to amend the Town's ordinance as they see fit.

### B.  Whether the Proposed Uses are Accessory Uses

Alternatively, the petitioner asserts that his proposed uses are accessory uses under the ordinance.  "An accessory use is not the principal use of the property, but rather a use occasioned by the principal use and subordinate to it."  <u>Fox v. Town of Greenland</u>, 151 N.H. 600, 606 (2004).  "An owner of property seeking to engage in an accessory use need not apply for a special exception, so long as the accessory use is incidental to a permitted principal use."  <u>Id</u>.  Consistent with the common law, the Town's ordinance defines an accessory use as a "use subordinate and customarily incidental to the main . . . use on the same lot."  The definition of accessory use in the ordinance involves several distinct elements.  <u>See</u> <u>Becker v. Town of Hampton Falls</u>, 117 N.H. 437, 440 (1977) (discussing ordinance that defined accessory uses as those that are "customarily incidental and subordina[te]" (quotation omitted)).  "[I]ncidental" and "subordinate" incorporate the requirement that the accessory use be minor in relation to the primary use and that it bear a reasonable relationship to that use.  <u>Id</u>.; <u>see</u> <u>Marchand v. Town of Hudson</u>, 147 N.H. 380, 383 (2001).  "[C]ustomarily" imposes an additional requirement that the accessory use "has commonly, habitually and by long practice been established as reasonably associated with the primary . . . use" in the local area.  <u>Becker</u>, 117 N.H. at 441 (referring to "local custom"); <u>see</u> <u>Town of Windham v. Alfond</u>, 129 N.H. 24, 29 (1986).  "While the strength or degree of the customary or habitual association does not lend itself to definition by formula, and while the combination need not occur in a majority of instances of the principal use, the uses must be associated with a frequency that is substantial enough to rise above rarity."  <u>Alfond</u>, 129 N.H. at 29 (citation omitted).

A landowner claiming the benefit of the accessory use doctrine bears the burden of proving that his use qualifies as an accessory use. See id. (discussing burden of proof in municipality's equity action against landowner); see also 2 E. Ziegler, Jr., Rathkopf's The Law of Zoning and Planning § 33:2, at 33-7 (2012).

Although we have previously stated that whether a proposed use constitutes an accessory use is a question of law for us to decide, we have recently clarified that it is, in fact, a mixed question of fact and law. See Bartlett v. City of Manchester, 164 N.H. 634, 643 (2013); 15 P. Loughlin, New Hampshire Practice, Land Use Planning and Zoning § 9.03, at 174 (4th ed. 2010) ("Whether a particular use is an accessory use is generally a question of both law and fact."). We review the trial court's application of the law to the facts de novo. Blagbrough Family Realty Trust v. A & T Forest Products, 155 N.H. 29, 33 (2007).

Here, the petitioner failed to establish that his proposed uses have "commonly, habitually and by long practice been established as reasonably associated with the primary . . . use" in the local area. Becker, 117 N.H. at 441. The petitioner presented a typewritten list of northern New England farms that purportedly "hold events and weddings." He also submitted printouts from the websites and/or brochures of nine farms in New Hampshire, which farms, he asserted, "are doing exactly what [he is] asking to do . . . in Henniker." Additionally, he presented testimony from the owners of Dimond Hill Farm in Concord and Gould Hill Farm in Hopkinton.

Assuming, without deciding, that all of the petitioner's evidence was relevant, we conclude that it was insufficient to establish that his proposed uses have "commonly, habitually and by long practice been established as reasonably associated" in the local area with farming in general, or Christmas tree farming in particular. Id. At best, the petitioner demonstrated that, out of the approximately 4,200 farms in New Hampshire, only nine or ten farms (other than his) host commercial events similar to his proposed uses. Only one of those farms is a Christmas tree farm, like the petitioner's farm, and that farm is located in Bethlehem, which is approximately 100 miles from Henniker. Additionally, according to the petitioner's typewritten list, there are only a handful of farms in other northern New England states that host events similar to those which he hosts (one farm in Vermont, one farm in Maine, and five farms in Massachusetts). With regard to all of the farms about which he presented evidence, the petitioner did not submit the zoning regulations under which those farms operate and presented no proof that the subject uses are deemed to be accessory uses in the communities in which the farms are located.

Assuming the relevance of the petitioner's evidence, we hold, as a matter of law, that it fails to prove that his proposed uses have "commonly, habitually

13

and by long practice been established as reasonably associated with the primary . . . use" in the local area. Id. Absent such evidence, we hold that the petitioner's proposed uses are not accessory uses under the Town's ordinance. Id. Because the petitioner has not prevailed, we need not address his argument that he is entitled to prevailing party attorney's fees and costs.

Affirmed.

CONBOY, LYNN, and BASSETT, JJ., concurred; HICKS, J., dissented.

HICKS, J., dissenting. It is abundantly clear that none of my four colleagues have spent a summer in East Colebrook, an area where weddings on farms are customary. Today, the majority holds that the trial court properly determined that hosting weddings and like events is not a permitted use in Henniker's rural residential district. The majority offers two separate and independent rationales for its decision: first, that both the plain language and legislative history of RSA 21:34-a (2012) fail to demonstrate a legislative intent to include "agritourism" in the statutory definition of "agriculture"; and second, that the proposed use is not an accessory use to the petitioner's farm. Because I disagree with the majority, under both rationales, I would reverse the trial court's decision. Therefore, I respectfully dissent.

Addressing the majority's interpretation of RSA 21:34-a first, I would conclude that the language of the statute that defines "agriculture" is ambiguous, at best. Given its placement in a statute titled "Farm, Agriculture, Farming," which exclusively defines farming and agricultural practices, it seems unlikely that the legislature would include the definition of "agritourism" without intending it to be considered part of farming or agriculture. See RSA 21:34-a. This conclusion is strengthened from the fact that the definition of "agritourism" includes certain activities that would constitute agriculture. See RSA 21:34-a, VI. For example, the statute defines "agritourism" to include "attracting visitors to a working farm for the purpose of . . . active involvement in the activity of the farm which is ancillary to the farm operation." Id. Paragraph II of RSA 21:34-a defines the activities and practices which constitute agriculture and includes "all operations of a farm" as the basis for those definitions. RSA 21:34-a, II (2012). Therefore, any agritourism activity that is "ancillary to the farm operation" would constitute agriculture pursuant to paragraph II, especially such activities that require "active involvement in the activity of the farm." RSA 21:34-a, II, VI (2012). Nevertheless, I recognize that the majority's interpretation of the statute is also reasonable and, thus, to resolve the ambiguity we must look to the legislative history to determine the legislature's intent. See United States v. Howe, 167 N.H. 143, 148-49 (2014).

When we interpret statutes, we do so "in light of the policy or purpose sought to be advanced by the statutory scheme." Montenegro v. City of Dover, 162 N.H. 641, 644-45 (2011). The provision defining "agritourism" began as a

14

recommendation from a New Hampshire Farm Viability Task Force (Task Force).  See Cultivating Success on New Hampshire Farms: The New Hampshire Farm Viability Task Force Report 41 (2006) available at http://agriculture.nh.gov/publications-forms/documents/farm-viability-report.pdf.  The Task Force was established in response to 2005 Senate Concurrent Resolution No. 1, which recognized that "farming and other agricultural interests are a vital part of New Hampshire's economy" and that "there are laws, rules, and regulations . . . hindering the economic viability of New Hampshire farms."  S. Con. Res. 1, 2005 Sess. (N.H. 2005).  The resolution recommended a task force to examine, in relevant part, methods for "[p]romoting and expanding agricultural based tourism, community supported agriculture, farmers' markets, farm stands, agricultural fairs, the horticulture industry, and pick-your-own enterprises."  Id.

The Task Force made three findings relevant to the issue of agritourism: (1) "farmers can't be expected to continue to operate viable farm businesses if the economically sensible behavior is to sell the land," Cultivating Success, supra at 9; (2) "farm businesses that have been able to sell innovative products[, processes, or services] have seen greater growth opportunities," Cultivating Success, supra at 8; and (3) "[t]oday's . . . farmers now face [the challenges of] the vagaries of local zoning boards, failure to be compensated for the public benefit they provide to the environment, and uncertain regulatory barriers," Cultivating Success, supra at 10.  To address the concerns raised by these findings, the Task Force recommended "[r]emov[ing] rules and regulations burdensome to agriculture" and adopting "[a] uniform definition of farming (as best described in RSA 21:34-a) that is consistent throughout state law and used by local land use boards."  Id. at 36-37.  Adding a definition of "agritourism"[1] to RSA 21:34-a was one of the proposed legislative actions to eliminate burdensome, confusing, or conflicting laws.  Id. at 40-41.  The clear purpose of this recommendation was to incorporate agritourism into the definition of "agriculture" and create a uniform definition to be used across the State.

Furthermore, these concerns and goals were re-emphasized at the public hearing before the Senate committee.  There, Gail McWilliam Jellie, Director of Agricultural Development of the New Hampshire Department of Agriculture, testified that "the income generated directly from [agritourism] activities . . . [is] important in the operation of the farm business," "and including agritourism in the state's definition of agriculture shows that New Hampshire recognizes the contribution to the industry and gives these activities credibility."  Relative to the Definition of Agritourism: Hearing on H.B. 56 before the Sen. Comm. on Energy, Env't and Econ. Dev. 7 (Apr. 10, 2007).  This sentiment was echoed by

---

[1] The original language proposed by the Task Force was "Agritourism: based on attracting visitors to farm operations for the purpose of eating a meal, making overnight stays, enjoyment, education or active involvement in the activity of the farm or operation."  Cultivating Success, supra at 41.

Robert Johnson, Director of the New Hampshire Farm Bureau Federation, who testified that "[w]e look at [agritourism] as enhancing farm viability through the opportunity created in what is today agriculture in New Hampshire. . . . It's a value-added service or an experience; that's where the profit is in agriculture in New Hampshire." Id. at 10-11. Accordingly, in light of the legislative history, I would conclude that to give full effect to the policy and purpose of the new "agritourism" definition, "agritourism" must be considered agriculture.

Including "agritourism" in the definition of "agriculture" does not mean, however, that the petitioner automatically prevails. Although the majority avoids the question of whether the petitioner's proposed activities constitute agritourism, for the petitioner to succeed he must demonstrate that his proposed uses fall within that definition. Paragraph VI of RSA 21:34-a includes as agritourism "enjoyment of the farm environment." RSA 21:34-a, VI. Frankly, I fail to see how hosting a wedding or any event in a tent overlooking or within the Christmas tree grove fails to constitute "enjoyment of the farm environment," especially when the petitioner goes to great lengths to incorporate elements of the farm into the space through such acts as using an altar made of balsam fir boughs. To the extent that the respondent and intervenors may argue that the income produced by the events exceeds that of the Christmas tree farm itself, I conclude that argument is irrelevant as it is not addressed by the statute and the legislature explicitly declined to craft such limitations. See id.; Hearing on H.B. 56, supra at 19-20 (declining to define a limit to agritourism activities). Nor does the statute prohibit the State or a municipality from enforcing generally applicable laws and ordinances governing such issues as noise, parking, or safety. Hearing on H.B. 56, supra at 3-4 (statement of Sen. Joseph Kenney). Thus, I conclude that RSA 21:34-a includes agritourism as part of the definition of agriculture and that the petitioner's proposed activities constitute agritourism. Accordingly, I would reverse the decision of the trial court on this basis.

Addressing the issue of accessory use next, I agree with the majority that: (1) the accessory use must be occasioned by the principal use and subordinate to it, see Fox v. Town of Greenland, 151 N.H. 600, 606 (2004); (2) Henniker's definition of accessory use, "use subordinate and customarily incidental to the main . . . use on the same lot," is consistent with our common law definition; and (3) to be "incidental" and "subordinate," a use must be minor in relation to the primary use and bear a reasonable relationship to that use.

The accessory use doctrine functions as a response to the impossibility of providing expressly by zoning ordinance for every possible lawful use. Town of Salem v. Durrett, 125 N.H. 29, 32 (1984). When a given use of land is not explicitly allowed, it is nonetheless permissible if it may be said to be accessory to a use that is expressly permitted. Id. The most frequently litigated requirement of accessory use is the meaning of customary, see Smith, Note,

Zoning: Accessory Uses and the Meaning of the "Customary" Requirement, 56 B.U.L. Rev. 542, 543 (1976), and setting a cogent definition of "customary" is a task that has routinely confounded courts since the adoption of the accessory use doctrine, see, e.g., State v. Smiley, 153 N.W.2d 906, 908 (Neb. 1967) ("[W]hat does 'customarily' mean, and to what geographical area should the test be applied?"); Jantausch v. Borough of Verona, 124 A.2d 14, 20 (N.J. Super. Ct. Law Div. 1956), aff'd, 131 A.2d 881 (N.J. 1957) ("What would 'customary' mean in the present setting? . . . Is 'customary' to be measured by reference to the state or to a more restricted area, perhaps the borough itself? And is 'customary' a mathematical concept in this context . . . ?").

Commentators have concluded that "[i]n determining whether a use is customary, courts may examine the entire community, or the general region, or even nationwide trends in an industry." 2 E. Yokley, Zoning Law and Practice § 8-3, at 8-5 (4th ed. 2009) (footnotes omitted); see also 7 P. Rohan, Zoning and Land Use Controls § 40A.03[3][c][iii], at 40A-32 (2012). Some jurisdictions, in fact, determine whether a proposed accessory use is customary using any of the three potential geographic limitations, without any particular rationale behind the choice. Compare, e.g., Appeal of Lord, 81 A.2d 533, 536 (Pa. 1951) (examining customary aspect of accessory use based on national trends), with Gross v. Zoning Board of Adjustment of City of Phila., 227 A.2d 824, 826 (Pa. 1967) (examining customary aspect of accessory use based on trends within a municipality), and Gold v. Zoning Board of Adjustment, 143 A.2d 59, 60 (Pa. 1958) (examining customary aspect of accessory use based on an indeterminate standard). In New Hampshire, we do not utilize a single geographic limitation in determining whether a proposed accessory use is customary. See, e.g., Marchand v. Town of Hudson, 147 N.H. 380, 384 (2001) (examining customary aspect of accessory use based on similar activity within the municipality); Nestor v. Town of Meredith, 138 N.H. 632, 634 (1994) (examining customary aspect of accessory use based on unspecified geographic limit); Durrett, 125 N.H. at 33 (referencing evidence from areas outside the municipality to support its analysis of the customary aspect of accessory use); Becker v. Town of Hampton Falls, 117 N.H. 437, 441 (1977) (examining customary aspect of accessory use based on activity within the municipality); see also Town of Windham v. Alfond, 129 N.H. 24, 29 (1986) (stating that the trial court could take notice of changing conditions in a portion of the state and infer that traditional rural stereotypes were no longer applicable to the area).

In Durrett, the issue was whether "use of an airstrip was . . . customarily associated with residential use." Durrett, 125 N.H. at 33. We observed that the trial court had considered testimony that "seaplanes had frequently landed at a pond located in a recreational zoning district in Salem." Id. (emphasis added). In our review of the trial court's decision, we concluded that the trial court could have reasonably found that use of an airstrip was not customarily associated with residential use because "there was no evidence to the contrary before the district court." Id. Nevertheless, we did consider evidence that arose

17

after the appeal had been filed regarding one household in another town that had been permitted to maintain a private landing strip. Id. We explained that "[o]ne instance in another town does not rise to the level of custom." Id. Accordingly, I agree with the petitioner that our decision in Durrett clarified that Becker did not establish rigid requirements for determining whether a use is customary.

In Alfond, the issue was whether "use of . . . residentially zoned property for the stabling and pasturing of horses kept for . . . personal recreation" constituted an accessory use. Alfond, 129 N.H. at 26. We observed that at trial there had been testimony stating that "during the past twenty years only six owners of Windham properties in residential zones had . . . kept horses." Id. at 29. Although this would suggest that we made our determination solely by looking at activities within the municipality, we also observed that "the trial court could properly take notice, N.H.R. Ev. 201(a), that Windham is in a portion of the State under pressure of residential crowding . . . from which the court could reasonably infer that traditional rural stereotypes are no longer sound indications of actual conditions in the area." Id. In making that observation, we held that the trial court could properly consider, as evidence, regional tradition and changing demographics in a region of the state when considering whether an accessory use is customary. Id. Accordingly, I believe our holding in Alfond further clarified our holding in Becker.

Furthermore, I believe limiting the inquiry to only the local area defies the very purpose behind the accessory use doctrine. Limiting the customary inquiry to the local area creates situations where, due to insufficient data, establishing customary use would be impossible. This is particularly true in smaller towns, such as Henniker. "The purpose of accessory use provisions is to permit uses that are necessary, expected or convenient in conjunction with the principal use of the land." Rohan, supra § 40A.01, at 40A-3. Commentators and jurists have recognized that:

> The difficulty with the requirement that a use be customary is that, literally applied, it would establish a class closed to uses not in existence at the time of the enactment of the ordinance. . . .
>
> Yet this narrow view of the customary requirement is not necessarily the one intended. . . . The purpose in choosing the word "customary" seems to have been evidentiary. It was designed to give examples of the kinds of uses that were acceptable but not necessarily to close the class of possible uses.

Id. § 40A.03[3][a], at 40A-26 to 40A-27; see also 2 E. Ziegler, Jr., Rathkopf's The Law of Zoning and Planning § 33.3, at 33-12 (2012) ("Naturally, the perception of which accessory uses are considered 'customary' changes with the times."); Dellwood Dairy Co. v. City of New Rochelle, 165 N.E.2d 566, 567

(N.Y. 1960) ("It is a common experience that new times bring . . . new ways of dealing with old [problems]."). Accordingly, a narrow construction of the customary requirement would mean "that only those already prevalent uses would be permitted." Smith, supra at 546. The result of such a construction "would be unacceptable stagnancy." Id. This stagnancy is the antithesis of the accessory use doctrine's purpose.

Rejecting this limitation, however, does not change the requirement that "the uses must be associated with a frequency that is substantial enough to rise above rarity." Alfond, 129 N.H. at 29. Although the majority concludes that the petitioner's evidence of farms in New Hampshire that host weddings and similar events is insufficient, I would conclude otherwise because he needs to demonstrate that such use "rise[s] above rarity," Alfond, 129 N.H. at 29, which he has done.

Furthermore, the record reflects that agritourism, generally, is "associated with a frequency that is substantial enough to rise above rarity." Id. The 2007 United States Census of Agriculture found that across the country 23,350 farms indicated that they provided agritourism and recreation services valued at $566 million.[2] 1 United States Department of Agriculture, 2007 Census of Agriculture 15 (2009) (table of income from farm-related sources), available in appellant's appendix, volume I at 109.

Within New Hampshire, Director Jellie, in her testimony before the Senate committee, cited a recent study conducted by Plymouth State University which found that "about a third of agriculture's total $935 million contribution to New Hampshire's economy is due to agritourism activities." Hearing on H.B. 56, supra at 6. This substantial relationship between agriculture and agritourism in both New Hampshire and across the country is sufficient to conclude that agritourism activities occur "with a frequency that is substantial enough to rise above rarity." Alfond, 129 N.H. at 29. Accordingly, I would conclude that agritourism is an accessory use.

This result would not provide the petitioner with a free hand to operate an event-hosting business under the false premise of a Christmas tree farm, as many throughout the proceedings in this case have alleged. Under the accessory use doctrine, an accessory use must be subordinate to the primary use. See Fox, 151 N.H. at 606. Although no bright-line rule exists for determining whether a use is subordinate, once the accessory use ceases to be subordinate to the primary use it ceases to be permissible. See KSC Realty Trust v. Town of Freedom, 146 N.H. 271, 274 (2001) (explaining that the

---

[2] Although it is not in the record before us, I note that the 2012 Census of Agriculture found that agritourism has increased across the country with 33,161 farms providing agritourism and recreation services valued at $704 million. 1 United States Department of Agriculture, 2012 Census of Agriculture 15 (2014) (table of income from farm-related sources).

definition of subordinate can shift depending on various factors). The agritourism definition limits agritourism activities because any such activity must have some connection to the farm, even if it is simply enjoyment of the farm environment. <u>See</u> RSA 21:34-a, VI. Permitting the occasional wedding or other event at the petitioner's farm is not a slippery slope. Rather, it protects the rural traditions of New Hampshire. Accordingly, I would reverse the decision of the trial court.

 For these reasons, I respectfully dissent.